IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| A-1 A-LECTRICIAN, INC.; H.Q. INCORPORATED, dba Aloha Products; GP ROADWAY SOLUTIONS, INC. (formerly Sun Industries, Inc.); HAWAIIAN ISLAND TIRE CO., INC., dba American Tire Company; ISLAND LIGHTING CO., INC.; JACK ENDO ELECTRIC, INC.; MARK LURIA; MEGA CONSTRUCTION, INC.; MUTUAL PLUMBING SUPPLY CO., INC.; PACIFIC JOBBERS WAREHOUSE, INC.; ROYAL CONTRACTING CO., LTD.; THE SOLARAY CORPORATION (formerly Inter-Island Solar Supply); TRITON MARINE CONSTRUCTION CORP.; UNITED TRUCK RENTALS AND EQUIPMENT LEASING, INC.; WALKER-MOODY CONSTRUCTION CO., LTD.; and RALPH S. INOUYE CO., LTD., | ) Civ. No. 12-00607 ACK-BMK ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Movants, | ) ) ) |
| v. | ) ) |
| COMMONWEALTH REIT; SELECT INCOME REIT; MASTERS PROPERTIES LLC; ROBIN 1 PROPERTIES LLC; TSM PROPERTIES LLC; and SIR REIT, | ) ) ) ) ) |
| Respondents. | ) ) ) ) |

_____ )

**ORDER LIFTING STAY; AMENDING THE COURT'S ORDER OF APRIL 26, 2013; DENYING LESSEES' MOTION TO CONSOLIDATE ARBITRATIONS; GRANTING LESSORS' CROSS-MOTION; AND DISMISSING ACTION**

The Court hereby lifts the stay imposed on this action by the Court's Order of April 26, 2013, and for the following reasons AMENDS its Order of April 26, 2013, DENIES Lessees' Motion To Consolidate Arbitrations, GRANTS Lessors' Cross-Motion, and DISMISSES this action.

## PROCEDURAL HISTORY

This dispute concerns twenty-four separate arbitrations currently proceeding between sixteen lessees of lots in a Honolulu commercial district ("Lessees") and their current landlords and affiliated companies ("Lessors"). The three current landlords are the successors-in-interest to an original, single landlord.

Lessees originally filed in state court a motion to consolidate their separate arbitrations. (See Doc. No. 1 & Exs.) On November 9, 2012, Lessors timely removed the action to this Court, invoking federal diversity jurisdiction. (Id.) In December 2012, Lessees re-filed their Motion To Consolidate before this Court (Doc. No. 37 ("MTC")), and Lessors filed a Motion To Dismiss the motion to consolidate (Doc. Nos. 25-33). On January 31, 2012, each side filed an opposition to the other's motion. (Doc. Nos. 44 & 45.) The parties filed Replies in support of their respective motions on February 28, 2013. (Doc. Nos. 49 & 50.) The Court held a hearing on the motions on April 23, 2013. (Doc. No. 56.)

After considering the parties' briefs[1] and oral arguments, the Court issued on April 26, 2013 an order staying

---

[1] Before hearing arguments on the parties' motions, the Court directed the parties to file briefs addressing whether, under Supreme Court jurisprudence, the Court had the power to decide the consolidation dispute. (Doc. No. 52.) The parties filed briefs (Doc. Nos. 53 & 54), and the Court ultimately concluded that it had the power to decide the dispute because both sides had agreed to submit the issue to the Court (see Doc. No. 57 at 10-12).

proceedings in this action for several weeks, so that the parties could undertake limited discovery to determine what the original parties to the leases intended or agreed to regarding consolidation. (Doc. No. 57 ("Stay Order") at 15, 17.)

As required by the Stay Order, on June 10, 2013, each side filed a supplemental brief and Concise Statement of Facts presenting the evidence obtained in discovery. (Doc. Nos. 84 ("Lessors' Supp."), 85 & 86 ("Lessors' CSF"), 87 ("Lessees' Supp.") & 88 ("Lessees' CSF").) The parties filed responses to one another's supplemental briefs and statements of fact on June 17, 2013. (Doc. Nos. 90 ("Lessors' Resp."), 91 ("Lessors' CSF Obj."), 92 ("Lessees' Resp."), & 93 ("Lessees' CSF Obj.").)

### FACTUAL BACKGROUND

Lessees are sixteen small business tenants who have ten years remaining on twenty-four separate long-term leases for lots in an Oahu commercial district, which will be referred to here as the Lower Mapunapuna Subdivision (see Lessors' Supp. at 4 n.1). Lessees comprise only about one-third of the Lower Mapunapuna tenants. (See MTC Ex. 39.)

### I.   Leases

Lessees (or their predecessors-in-interest) entered into the leases at issue here with the Damon Estate, the previous owner of the Lower Mapunapuna land, between November 1972 and April 1973, except for one lease which was executed in 1994. (MTC Exs. 1-24 & 40.) The lease agreements were drafted by the Damon Estate's attorneys. (Lessees' CSF ¶ 4.)

In 1972, the Lower Mapunapuna lots were already being leased from the Damon Estate, and the rent on the lots was due to be reset on January 1, 1973. (See Lessees' CSF Ex. 1-B, at 1.) Sometime in 1972, "a number of Damon Estate lessees" formed a "committee to negotiate with the estate trustees" regarding the rent reset. (Id. at 1-2.) The Damon Estate Trustees discussed the rent readjustment with "representative Mapunapuna lessees" and ultimately offered each tenant a choice of either a rent increase for the next ten-year term or a new fifty-year lease. (Lessees' CSF Ex. 1-C.) The Estate's initial offer letter stated that the Estate aimed "to give equal treatment to all Damon Estate lessees." (Lessees' CSF Ex. 1-A, at 2.)[2] The tenants who are party to this action (or their predecessors-in-interest) apparently chose to sign new fifty-year leases. (See MTC Exs. 1-24 & 40.)[3]

The initial rents under the new fifty-year leases were apparently set at a uniform rate per square foot. (See Lessors' CSF Exs. 1-A & 1-C.) Under a provision identical in all the leases, the rent was to be reset every ten years, in 1983, 1993,

---

[2] David M. Haig, who is the current chair of the Damon Estate Trustees and has served as a Trustee since 1982, testified at deposition that "[a]s a trustee negotiating, . . . it was beneficial to us to have everybody on the same piece of paper," and that "[t]he trustees tried very much to provide some uniformity amongst the lease rents." (Lessors' Supp. Ex. G ("Haig Dep."), at 11:8-25, 14:1-4 & 27:7-25.)

[3] As noted above, there is one exception – the lease now held by The Solaray Corporation (d.b.a. Lorax, LLC) was executed in 1994. (See MTC Ex. 7.) Neither party has explained the circumstances behind this exception and it does not appear to be material.

2003, and 2013. (Lessees' CSF ¶ 8.) The reset rent was to be an amount agreed upon by the parties, or if no agreement could be reached, an amount determined by arbitration. (<u>See, e.g.</u>, MTC Ex. 1, at 12-13; <u>see</u> Lessees' CSF ¶ 7.)

The Damon Estate was the landlord of the Lower Mapunapuna Subdivision until 2003. (Haig Dep. at 103:11-21.) During that period, as described below, the parties never had to resort to arbitration; the Lower Mapunapuna rents were always reset via negotiation. (Lessees' CSF ¶ 10; <u>see</u> Lessors' CSF Obj. ¶ 1.)

## II.  **1982-83 Rent Reset**

In mid-1982, some Lower Mapunapuna tenants formed a tenants' association (the "Association"), with the "primary purpose" of negotiating leases and rents with the Damon Estate. (Lessees' CSF, Declaration of Ross Moody ("Moody Decl.") ¶ 5; Lessees' CSF Exs 8-10.)

The Association sought to enroll all Lower Mapunapuna tenants. A newsletter dated August 1982 noted that thirty-three of the fifty master lease holders had joined the Association. (Lessees' CSF Ex. 13, at 1.) The newsletter noted "we must do all in our power to operate as a unit, that is, that the Association handle negotiations for everyone." (<u>Id.</u>) The tenants who are parties to this action all either were members of the Association

or are successors-in-interest to members. (Lessors' Supp. at 9-11.)[4/]

Another Association newsletter, dated August 27, 1982, described the Association's first meeting with the Damon Estate Trustees. (Lessees' CSF Ex. 14.) The newsletter states that the Trustees "talked about negotiating on an individual basis" but also said they "would be willing to sit down and negotiate with our group." (Id. at 1.) The newsletter concludes by noting that some tenants "feel that their participation with our group is not necessary," and urging those tenants to join the Association. (Id. at 2.)

On December 21, 1982, the Damon Estate wrote to the Association, "[b]ased on your representation that the [Association] has commitments from the majority of the lessees in the [Lower Mapunapuna Subdivision] to accept the rent . . . as proposed by your Committee, the Trustees . . . approved those proposed rents as follows." (Lessees' CSF Ex. 11, at 1.) The proposed rents were not uniform, instead dividing the Subdivision into three different rent zones, one of which was "to be negotiated on an individual basis." (Id.) In January 1983, the

---

[4/] There may, again, be one exception, although neither party fully explains it. Royal Contracting was not a charter member of the Association and does not appear to be a successor-in-interest to a charter member (see Lessees' Supp. at 10-11; Lessees' CSF Ex. 6), but, as will be discussed below, was one of a group of tenants who wrote to the Damon Estate in 2002 using Association letterhead (see Lessees' CSF Ex. 22, at 2). It appears, however, that the Association had been dissolved in November 1998 (see Lessors' Resp., Ex. Z), and it is therefore not clear that Royal was ever a member of the Association.

Damon Estate wrote to individual tenants offering the rents "recommended by the Association and agreed to by the Trustees." (Lessees' CSF Ex. 12.) The letter asked the tenants to accept their new rent rate by signing and returning a copy of the letter. (Id.)

Mr. Haig testified in his deposition that "the trustees found it useful to call upon the leadership of the Tenants Association to help us communicate with our tenants." (Haig Dep. at 20:23-21:9.) He stated "they were perhaps better messengers to try to make . . . the tenants feel more comfortable" and that "we were happy to talk with anybody, you know. . . . [W]e always learned something by talking to our lessees . . . ." (Id. at 21:16-19 & 26:2-11.)

### III. 1992-93 Rent Reset

When rents were due to be reset for the second time, the Association once more negotiated with the Damon Estate Trustees. On January 26, 1993, the new president of the Association wrote to its members discussing the rent reset and noting "let me remind you there is strength in numbers." (Lessees' CSF Ex. 3.) On July 16, 1993, the Association wrote to the Damon Estate proposing new rents and stating that the Association "feels confident that the vast majority of lessees represented by the Association will accept the above rental terms." (Lessees' CSF Ex. 2.)

In 1992-1993, the Damon Estate was also negotiating a rent reset with tenants in another commercial district, which

will be referred to here as the Upper Mapunapuna Subdivision (see Lessors' Supp. at 4 n.1). A group of four tenants calling themselves the "Upper Mapunapuna Tenants Group" sent the Damon Estate a rent offer in July 1992. (Lessees' CSF Ex. 15.) The Trustees rejected the offer and initiated arbitration. (See Lessees' CSF Ex. 16.) The Trustees agreed to a consolidated arbitration with the tenants in the Upper Mapunapuna Tenants Group and two other Upper Mapunapuna tenants. (See Lessees' CSF Ex. 17; Haig Dep. at 35:19-36:21 & 74:20-24; see also Haig Dep. at 84:24-25 (stating that the Trustees agreed to consolidate these arbitrations "as a convenience" because they "felt it was in our interest").) Mr. Haig noted in his deposition that the properties at issue in the consolidated proceeding had originally been part of a single lease. (Haig. Dep. at 35:19-36:21.)

Negotiations over the Lower Mapunapuna rents were delayed by the Upper Mapunapuna arbitration. (See, e.g., Lessees' CSF Ex. 3.) The Association's president wrote to its members that if the delay was causing them hardship, "I would suggest that you contact the Trustees to discuss your individual situations." (Id.) Ultimately, the Damon Estate Trustees offered the Lower Mapunapuna tenants a rent per square foot that was twenty-five percent less than the rate determined by the arbitration of the Upper Mapunapuna rents. (Lessees' CSF Exs. 3 & 4; Haig Dep. at 77:4-78:11 & 86:21-88:7.) Again, the Estate sent individual letters to each Lower Mapunapuna tenant confirming their individual rent offer and asking each tenant to sign and return

their offer letter. (Lessees' CSF Ex. 20.) The letter noted that the offer would be withdrawn if not accepted within thirty days. (Id. at 2.)

**IV.   2002-03 Rent Reset**

In 1997, the Damon Estate offered Lower Mapunpuna tenants in good standing a waiver of owed back-rent and a choice of two plans for future rents covering either the next six or the next sixteen years. (See Lessees' CSF Ex. 21; Haig Dep. at 96:7-98:23.) This meant that some Lower Mapunapuna tenants' rents were not reset in 2002-03. On December 6, 2002, however, a group of nine Lower Mapunapuna tenants whose rents apparently were being reset wrote to the Damon Estate on Association stationery,[5/] rejecting a recent rent offer from the Estate and stating that "pursuant to Section (B) in our leases" they wished "to collectively pursue arbitration." (Lessees' CSF Ex. 22.) One of those nine tenants, Royal Contracting Co., is a party to this action. (See id.)

Counsel for the Damon Estate replied on December 26, 2002. (Lessors' CSF Ex. B.) He pointed out that the Estate had no contractual relationship with the Association and stated that "[d]iscussions with your association to date were only a courtesy to our Lessees listed in your letter." (Id. at 1.) He advised the tenants that "the Estate has no intention of entering into a

---

[5/] It appears that the Association had dissolved in November 1998. (See Lessors' Resp. Ex. Z.) Moreover, it is not clear whether these nine tenants comprised the entire membership of the Association at the time, if it was still in existence then. (See, e.g., Lessees' CSF Ex. 6.)

single arbitration as to all of the Lessees indicated in your letter," and that "[t]he Estate will deal with each Lessee per the terms of its respective lease." (Id.) He stated that the Estate would contact each of the nine tenants individually to discuss arbitration. (Id.) The letter went on to notify these tenants of the Estate's chosen arbitrators; the Estate chose three different arbitrators, who were each to be assigned three separate arbitrations. (Id. at 2.)

On December 30, 2002, the Estate's counsel wrote to the individual tenants, stating that "the law does not allow the Association to consolidate all of the individual arbitrations into a single arbitration" because "the right to arbitration is a contractual arrangement to which only [the tenant] and [the Estate] are parties." (Lessors' CSF Ex. C, at 1 (emphasis in original).) The letter explained the Damon Estate's view of the state law applicable at the time and repeated the Estate's position that "the Lessees do not have the ability to force consolidation of the arbitration proceedings." (Id. at 2.) It appears that no arbitration ever proceeded.

The Estate's attorney's letters are consistent with Mr. Haig's deposition testimony. Mr. Haig repeatedly testified that the Damon Estate Trustees understood consolidation to be an option only if both parties agreed to it; "if both parties didn't agree, then it would not be possible to do it." (Haig Dep. at 122:4-7.) He explained that the Trustees "specifically said that if [the tenants] attempted to go to an appraisal as a group, we

would resolve that problem by appointing a separate appraiser. . . . [I]f they had attempted to force the issue of a . . . joint appraisal, . . . we would respond by appointing individual appraisers to . . . counter that." (<u>Id.</u> at 107:25-108:22.) He agreed with Lessors' counsel's characterization that "regardless of how lease rent negotiations were conducted, the Estate always retained the right to proceed separately with the individual lessee in an appraisal proceeding." (<u>Id.</u> at 117:2-8.)

Mr. Haig testified that he was "sure" the Trustees had shared the above view with some of the Damon Estate's tenants, though he could not remember a specific occasion when he had done so. (<u>Id.</u> at 110:15-111:2.) Mr. Haig testified that he believed it was "always the position of the trustees" that they wanted to "do everything possible" to reach a negotiated rental rate, but "at the same time, wanted to do everything possible to avoid" having "somebody else [i.e., an arbitration panel] reaching a conclusion with a large group of our tenants." (<u>Id.</u> at 124:6-15.) He testified that the Estate viewed allowing a single arbitration proceeding over such a large area of property as "bad business judgment." (<u>Id.</u> at 110:4-9.)

## V.   <u>Negotiations and Consolidated Arbitrations with Lessors</u>

In December 2003, the Damon Estate sold both its Lower Mapunapuna and Upper Mapunapuna properties to Lessor CommonWealth REIT (then known as HRPT Properties Trust). (Haig Dep. at 103:11-21.) Since Lessors took over as landlords, they have engaged in several consolidated rent arbitrations with Upper Mapunapuna

tenants, in which separate proceedings concerning different lots leased by a single tenant were consolidated into one arbitration. (See Lessees' CSF ¶ 22; Lessors' CSF Obj. ¶ 22; Lessors' CSF Ex. H (Deposition of Jan Yokota) at 70:17-73:25.) There is no evidence, however, that Lessors have ever engaged in a consolidated proceeding with multiple tenants.

As of June 17, 2013, Lessors had reached agreements on rents with fifteen Lower Mapunapuna tenants. (Lessors' Resp., Declaration of Jan Yokota, ¶ 4.) These agreements were reached through separate negotiations with each individual tenant. (Id.)

**DISCUSSION**

**I.   Amendment to the Stay Order**

As a preliminary matter, both parties attempt in their supplemental briefs to revisit state-law issues addressed by the Court's Stay Order.

First, Lessors attempt to reargue whether, under Hawaii state law, the Court should look to extrinsic evidence at all. (See Lessors' Supp. at 15-20.) Lessors had ample opportunity to present arguments on this issue two months ago in the briefing on the two cross-motions; in fact, Lessors discussed the issue extensively in their Reply in support of their Motion To Dismiss (see Doc. No. 49 at 8-13). Lessors did not file a motion for reconsideration, and the time for such a motion has long passed. See L.R. 60.1(c). The Court will not allow Lessors to untimely reopen a legal issue that the parties already fully briefed and

12

the Court decided, where Lessors do not allege any intervening change in the law.

Second, Lessees assert in a footnote that the Court's reading of Hawaii Revised Statutes chapter 658A as stated in the Court's Stay Order (Doc. No. 57 at 15-16) is inconsistent with the Hawaii Supreme Court's decision in AFSCME Local 646 v. Dawson International, Inc., 149 P.3d 495, 511-12 (Haw. 2006). (Lessees' Supp. at 27 n.4.) Lessors had the opportunity to respond to Lessees' footnote (see Doc. No. 90), but did not do so. In contrast with the extrinsic evidence issue that Lessors attempted to reopen, the parties had not briefed this aspect of the statute at the time the Stay Order was issued - the Court raised it sua sponte at the hearing on the cross-motions. The Court agrees with Lessees' (unopposed) reading of the applicable state law, and hereby amends the Stay Order as follows. On pages 15-16, the text of section VI is deleted in its entirety and replaced with the following:

> Finally, Lessees appear to argue that even if the parties did not agree to consolidation, the Court may force consolidation upon the Lessors under Hawaii Revised Statutes § 658A-10. (Opp'n to MTD at 20-21.)[6/] The Court disagrees. As discussed above, the FAA requires federal courts to enforce arbitration agreements according to their terms. 9 U.S.C. § 4. In order to do so, the Court must inquire as to what terms the parties agreed to. The Court may not, however, order a procedure that the parties

---

[6/] Counsel for Lessees appeared to disavow this argument at the hearing on the motions, arguing instead that the state law merely illuminated the parties' intent. The Court nonetheless addresses this issue for completeness' sake.

did <u>not</u> agree to. Such an order would not be consistent with the FAA, which "imposes . . . the basic precept that arbitration is a matter of consent, not coercion." <u>Stolt-Nielsen</u>, 130 S.Ct. at 1773.

The "overriding goal" of the FAA, even above promoting the expeditious resolution of claims, is "to ensure judicial enforcement of privately made agreements to arbitrate." <u>Dean Witter</u>, 470 U.S. at 219. Thus, in <u>AT&T Mobility</u>, the Supreme Court held that a California state-court rule which refused to enforce class-action waivers in arbitration agreements was preempted by the FAA. 131 S.Ct. 1740. The Supreme Court repeated that the "principal purpose" of the FAA is to "ensure that private arbitration agreements are enforced according to their terms." <u>Id.</u> at 1748 (quoting <u>Volt</u>, 489 U.S. at 478.) It held that section 4 of the FAA "requires courts to compel arbitration 'in accordance with the terms of the agreement,'" and noted that the Court had already held that "parties may agree . . . to arbitrate according to specific rules, and to limit <u>with whom</u> a party will arbitrate its disputes." <u>Id.</u> at 1748-49 (citations omitted; emphasis in original).

The Court went on to hold: "Arbitration is a matter of contract, and <u>the FAA requires courts to honor parties' expectations</u>. . . . States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." <u>Id.</u> at 1752-53 (emphasis added; citation omitted); <u>see</u> <u>Dean Witter</u>, 470 U.S. at 220-21 ("The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation . . . .") The Supreme Court's reasoning in <u>AT&T</u> and <u>Dean Witter</u> is directly applicable here. This Court may not apply a state statute to force the parties into an arbitration procedure that the parties did not agree to, even if the state - or this Court - believes that the procedure would be more efficient.

This amendment does not change the outcome of the Stay Order.

The Court now turns to the evidence presented by the parties in their supplemental briefing.

## II.   Evidence as to Parties' Intent & Practice

As discussed more fully in the Court's Stay Order, the Federal Arbitration Act ("FAA") "imposes . . . the basic precept that arbitration is a matter of consent, not coercion." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1773 (2010); see also id. at 1776 ("[W]e see the question as being whether the parties agreed to authorize class arbitration."). The Court's duty under the FAA is to "give effect to the contractual rights and expectations of the parties," and in that endeavor, "the parties' intentions control." Id. at 1774. The question addressed by the parties' limited discovery and supplemental briefing was what, exactly, the parties to the leases intended or agreed to.[7]

The parties do not dispute that, even though the Damon Estate routinely negotiated rents with the Association, the Damon Estate never participated in a consolidated arbitration involving Lower Mapunapuna tenants. (See Lessees' CSF ¶ 17.) Lessees argue that the Damon Estate nonetheless implicitly committed to holding consolidated arbitrations with its Lower Mapunapuna tenants if

---

[7] In the Stay Order, the Court noted that the Supreme Court's decision in Oxford Health Plan v. Sutter, No. 12-135, was pending and might illuminate what evidence a court may examine to determine the parties' intent. (Stay Order at 14 n.5.) That opinion has now been published, see 2013 WL 2459522 (U.S. March 24, 2013), but is not helpful here given the specific facts and procedural posture of this case.

arbitration became necessary. For the following reasons, the Court finds Lessees' arguments unconvincing.

### A.   Uniform Rents

Lessees emphasize that the initial rents were set in 1972-73 at a uniform rate per square foot and that Mr. Haig testified that the Trustees "tried very much to provide some uniformity amongst the lease rents." (See Lessees' Supp. at 7-8.) There is no evidence, however, that either side believed the rent per square foot was required to be uniform. Indeed, it is undisputed that the rent did not remain uniform in later years. (See id. at 8.) The fact that the Trustees preferred to keep the Lower Mapunapuna rents similar does not demonstrate that the rents were required to be identical or were considered to be unitary. Moreover, although the Damon Estate apparently offered its 1972-1973 rent rates after discussions with "representative Mapunapuna lessees" (see Lessees' CSF Ex. 1-C), Lessees have presented no evidence that this tenants' committee (see Lessees' CSF Ex. 1-B) was anything more than a voluntary, non-binding discussion group. The Association did not exist when the leases were executed; it was formed in 1982, in anticipation of the first rent reset. (Moody Decl. ¶ 5.) Indeed, as discussed below, the Association also appears to have been a voluntary, non-binding group, that did not necessarily even include all of the Lower Mapunapuna tenants.

16

**B.   Group Negotiations**

Lessees argue that because the Damon Estate participated in group negotiations, the Estate was somehow required to submit to consolidated arbitration, if arbitration became necessary. Lessees repeatedly assert that negotiation and arbitration were "one continuous" "intertwined, integrated," "singular" process. (Lessees' Supp. at 3, 4.) Lessees have failed to present a convincing rationale for why it should be so, however. While the leases discuss arbitration procedures, they say nothing at all about negotiation. (See, e.g., MTC Ex. 1, at 12-13.) Moreover, the contemporaneous documentary evidence shows that during each rent reset period, both sides regarded the group negotiations via the Association as voluntary, and believed that individual negotiations could occur at any time.

First, the evidence demonstrates that all Lower Mapunapuna tenants were not required to join the Association, and that some did not join. (See Lessees' CSF Ex. 13, at 1 (thirty-three of fifty leaseholders joined).) Indeed, the leaders of the Association repeatedly urged tenants to join the group and to remain with the group. (See, e.g., Lessees' CSF Ex. 3, at 1 ("Please let me remind you there is strength in numbers . . ."); Lessees' CSF Ex. 10 ("We urge you to attend.").) The Association explained in its August 1982 newsletter:

> Follow-up work is being carried out to insure that we secure 100% participation. That's our objective . . . . [W]e must do all in our power to operate as a unit, that is, that the Association handle negotiations for everyone.

17

This will improve everyone's chances for a
more favorable rent . . . .

(Lessees' CSF Ex. 13, at 1.)

Second, the evidence demonstrates that the Association
believed that the Trustees' dealing with the Association was
entirely voluntary, both initially and during the later rent
resets. During the Association's very first meeting with the
Damon Estate Trustees, the two sides discussed the possibility of
"negotiating on an individual basis, programming the rent
increases to meet various conditions that individuals might find
more suitable to their acceptance." (Lessees' CSF Ex. 14, at 1.)
The Association's account of the meeting then notes that the
Trustees "said that [they] would be willing to sit down and
negotiate with our group." (Id. (emphasis added).) There is no
suggestion that the Trustees were required to negotiate with the
Association, or could not negotiate separately with individual
tenants. In 1993, noting that the Lower Mapunapuna rent
negotiations were being delayed by the Upper Mapunapuna
arbitration, the Association's president wrote to its members
that if any of them would suffer hardship from the delay, "I
would suggest that you contact the Trustees to discuss your
individual situation." (Lessees' CSF Ex. 3.) And in 1997, the
Damon Estate offered waivers of owed back-rent and a choice of
future payment plans individually to each tenant. (See Lessees'
CSF Es. 21; Haig Dep. at 96:7-98.23.)

Third, the conduct of the negotiations demonstrates
that the Association could not bind its members. The

18

Association's proposal letters note that "the Association feels confident that the vast majority of lessees represented by the Association will accept the above [proposed] rental terms." (Lessees' CSF Ex. 2.) The Damon Estate considered the Association's proposals on the understanding that the Association's members had individually agreed to the proposal. (See, e.g., Lessees' CSF Ex. 11, at 1 (approving proposed rents "[b]ased on your representation that the [Association] has commitments from the majority of the lessees . . . to accept the rent . . . .").) Then, once the Estate and the Association had settled on a proposed rent, the Estate sent individual, revocable letters to each tenant offering that rent. For instance, in a letter from the Estate to the Association dated December 21, 1982, the Estate says:

> We understand you will furnish us a list of your members who have agreed to these rents whereupon we will furnish you with a letter agreement for submission to and execution by such members establishing the rent for the ensuing 10 year period. Those choosing not to sign up as indicated above will be contacted in due course by the Estate to seek agreement or proceed to arbitration.

(Lessees' CSF Ex. 11, at 1.) The individual members could accept or reject the offer sent to them. (See, e.g., Lessors' CSF Ex. 12 (1983 letter); Lessors' CSF Ex. 20, at 2 (1993 letter, noting that offer would be withdrawn if not accepted within thirty days).) The correspondence thus demonstrates that at every stage of the negotiation, each tenant was individually free to accept

or reject the proposed rent and was never bound by the Association.[8]

In sum, the Estate's negotiations with the Association do not demonstrate an agreement to treat all Lower Mapunapuna tenants as a unified bloc, or even an agreement to treat only the Association's <u>members</u> as a unified bloc. Nor do they demonstrate a custom, practice, or course of conduct of so doing. All the contemporaneous documentary evidence is consistent with Mr. Haig's testimony that the Damon Estate Trustees voluntarily worked with the Association because they "found it useful . . . to help us communicate with our tenants." (Haig Dep. at 21:6-9.)

**C.   2002-2003 Rent Reset**

Lessees' theory of an "integrated" negotiation-and-arbitration process is also seriously put in doubt by the events surrounding the 2002-03 rent reset.

First, tenants in good standing had apparently been given offers in 1997 to freeze or write off some of their rent for either six or sixteen years. (<u>See</u> Lessees' CSF Ex. 21; Haig Dep. at 96:4-98:23.) Mr. Haig's deposition testimony and the text of the letter itself make clear that not all tenants were given this offer. (Haig Dep. at 96:4-98:23; Lessees' CSF Ex. 21.) Each eligible tenant was given two payment plan options to select from (<u>see</u> Lessees' CSF Ex. 21), and Lessees have presented no evidence

_____

[8] For this reason, Lessees' claim that the Trustees "explicitly recognized that the Association acted as the lessees' representative to set the lease rent" (Lessees' Supp. at 3 & CSF ¶ 12) overreaches. Neither side believed or behaved as though the Association was its members' legal representative.

of any group negotiation of this offer or group discussion of its acceptance. In other words, there is no evidence that the tenants acted as a unitary group with regard to this offer.

Second, the group of nine tenants that in 2002 requested a consolidated rent arbitration included only one of the parties to the present action, Royal Contracting. (See Lessees' CSF Ex. 22.) In other words, the other fifteen Lessees did not act with Royal in 2002. Again, this fact contradicts Lessees' theory that rent could be negotiated and arbitrated only with all the tenants, or that the Lower Mapunapuna tenants, or even just the Lessees, believed themselves to be a unitary group.

Third and finally, the Damon Estate's responses to the 2002 request for consolidated arbitration made crystal clear the Estate's position on consolidation, i.e., that negotiations with the Association group had been a courtesy to the tenants and that the tenants could not force consolidation upon the Estate. (See Lessors' CSF Exs. B & C.)

The Damon Estate's 2002 letters are damning for Lessees' case. Lessees therefore argue that these letters "sought unilaterally to amend the parties' mutually-established method of carrying out the rent reset process." (Lessees' Supp. at 29.) The Court disagrees. For all the reasons discussed above, the evidence presented does not show or even imply that either side believed during the 1982-83 and 1992-93 rent resets that group action was required or could be forced upon an unwilling party.

### D.   Discussions of Arbitration During Negotiations

It is clear that the Damon Estate and its tenants always discussed arbitration during their rent negotiations. For example, notes dated April 19, 1993 from a meeting between the Trustees and Association leadership state: "DAMON WISHES TO AVOID FUTURE ARBITRATIONS. A. GOOD WILL CONSEQUENCES. B. COSTLY." (Lesses' CSF Ex. 5, at 1.) Mr. Haig testified that arbitration was always discussed during negotiations, and that the Trustees always communicated that they wished to avoid arbitration if possible. (Haig Dep. at 15:21-16:4.)

The two sides disagree as to whether individual arbitrations were ever discussed. Mr. Haig testified that he was "sure" the Trustees had shared with tenants their view that the Estate had the right to insist on individual arbitrations, though he could not recall a specific instance when they had done so. (Id. at 110:19-111:2.) Mr. Moody, on the other hand, asserts that the Estate never raised the threat of separate arbitrations. (Moody Decl. ¶ 21.)

Lessees' arguments on this point are inconsistent, however. On the one hand, Lessees argue that the Damon Estate could not have required individual arbitrations, given the parties' history of group negotiations. On the other hand, Lessees repeatedly claim, based on Mr. Haig's deposition testimony, that the Damon Estate Trustees "bullied" their tenants with the threat of arbitration. (See, e.g., Lessees' CSF ¶ 9; Lessees' Resp. at 6-7 & n.2.) When Mr. Haig used the term

22

"bullying," however, he was referring to using the threat of <u>individual</u> arbitrations. (<u>See</u> Haig Dep. at 109:5-17 (testifying in response to the question "What would be the purpose of appointing separate . . . appraisers for each lot?"); <u>id.</u> at 109:18-21 (next question: "So the purpose of appointing separate appraisers for separate lots, even if it was the same tenant, would be to put some pressure on [the tenants], to bully them, as you say?").)[9] Lessees' claim that "[h]ad the Damon Estate's 'bullying' not succeeded, consolidated arbitration was the next step" (Lessees' Supp. at 4) is therefore particularly unconvincing.

## E.   Consolidation As An Option

Both sides have presented copious evidence that both the Lower Mapunapuna tenants and the Damon Estate believed that group negotiations and consolidated arbitrations were available <u>options</u> if all parties agreed to them. The Court therefore disagrees with Lessors' assertion that "the Damon Estate always understood the 'Appraisal' provision as authorizing bilateral arbitration only" (Lessors' Supp. at 8). The evidence indicates that the Trustees believed arbitrations could be consolidated if all parties agreed to it. Indeed, Mr. Haig testified that if it had come to arbitration, the Trustees "might not [have gone] for an individual appraisal for each lot," but, "at the very least

---

[9] The Court notes that Mr. Haig explicitly corrected his use of the verb "bully" later in the deposition, stating that it mischaracterized the Trustees' intentions. (Haig Dep. at 124:6-7.)

. . . would certainly [have tried] to break it up into a number of appraisal processes." (Haig Dep. at 110:6-9.) Moreover, the Damon Estate agreed to a consolidated arbitration with a group of tenants in the Upper Mapunapuna Subdivision where the lots at issue had originally been leased as a single property. (Haig Dep. at 35:19-36:21, 74:20-24, & 84:24-25.)

Thus, the Court does not disagree with Lessees' characterization that "the original parties to the subject leases intended to <u>allow for</u> the consolidation of arbitration proceedings." (Lessees' Supp. at 26 (emphasis added).) As Lessors correctly note, nothing in the leases <u>prohibits</u> the parties from agreeing to consolidated proceedings. (Lessors' Resp. at 16.) The parties' discovery and supplemental briefing has raised a more granular question about the parties' intent under the leases, however – namely, <u>under what conditions</u> the parties intended that arbitrations could be consolidated. Lessees have presented no evidence that either side intended or expected that consolidation could be forced upon an unwilling party. Rather, the evidence demonstrates that the Lower Mapunapuna tenants did not always act as a group, but only did so when they felt it was in their best interests, and even then did not necessarily include every Lower Mapunapuna tenant. Similarly, the evidence shows that the Damon Estate did not expect or intend for consolidation to occur unless all parties consented to it.

The Court's duty under the FAA is to give effect to the parties' contractual rights and expectations. <u>Stolt-Nielsen</u>, 130

24

S.Ct. at 1774. In so doing, the parties' intentions control. <u>Id.</u> Here, the Court finds that the parties to the leases intended consolidated proceedings to be an option only if all parties agreed to consolidate. Since Lessors emphatically do not agree to consolidate these arbitrations, the Court must deny Lessees' motion to consolidate.

<u>**CONCLUSION**</u>

The Court hereby LIFTS the temporary stay in this action and, for the foregoing reasons: (1) AMENDS its Order of April 26, 2013 (Doc. No. 57) as described above; (2) DENIES Lessees' Motion To Consolidate Arbitrations (Doc. No. 37); and (3) GRANTS Lessors' Cross-Motion (Doc. No. 25). This action is DISMISSED so that separate arbitrations may proceed in accordance with the terms of the leases.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 27, 2013



_____
Alan C. Kay
Sr. United States District Judge

<u>A-1 A-Lectrician, Inc. v. CommonWealth REIT</u>, Civ. No. 12-00607 ACK BMK, Order Lifting Stay; Amending Order of April 26, 2013; Denying Lessees' Motion To Consolidate; Granting Lesssors' Cross-Motion; and Dismissing Action